**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **PLAINTIFF A,** | § | **CIVIL ACTION NO.** ___6:16CV1128 - RWS___ |
| | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **DEFENDANTS B, C, D, E, F, AND G** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT (SEALED)**

*This document and all attachments are being*
*filed ex parte/in camera and under seal.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **THE UNITED STATES** | § | **CIVIL ACTION NO. _____** |
| **OF AMERICA** e*x rel.* | § | |
| **IRAJ ROSHAN,** | § | |
|     *Plaintiff,* | § | |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **EAST TEXAS MEDICAL CENTER,** | § | |
| **TRINITY-MOTHER FRANCES HEALTH** | § | |
| **SYSTEM, CHRISTUS TRINITY** | § | |
| **MOTHER FRANCES HEALTH SYSTEM,** | § | |
| **CHRISTUS HEALTH,** | § | |
| **TYLER RADIOLOGY ASSOCIATES,** | § | |
| **and TYLER CARDIOVASCULAR** | § | |
| **CONSULTANTS,** | § | |
|     *Defendants.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

*This document and all attachments are being*
*filed ex parte/in camera and under seal.*

INTRODUCTION AND NATURE OF CASE ........................................................................1

PARTIES .................................................................................................................................3

JURISDICTION AND VENUE .............................................................................................5

BACKGROUND AND REGULATORY FRAMEWORK .................................................5

I.      Background on the False Claims Act and the qui tam private Attorney General provisions.

II.     Reporting Requirements and Payments ...............................................................7

        A.      Hospitals and providers are required to certify compliance with all laws and related regulations as a condition and prerequisite to receiving Medicare payments. ....................................................................................................7

        B.      A hospital violates the False Claims Act by filing a false claim or falsely certifying compliance with all laws and submitting false claims. ...........................9

III.    The Government's damages for false certification and fraudulent bills extend to all Medicare payments made to the Defendants, plus other statutory penalties. ....................11

FACTS .................................................................................................................................13

      Billing for Services Not Performed .................................................................................13

           East Texas Medical Center and Tyler Radiology Associates ................................13

           Violations by Tyler Cardiovascular Consultants and ETMC ................................18

           Violations by Trinity-Mother Frances Health System...........................................20

      Up Coding...........................................................................................................................21

           East Texas Medical Center and Tyler Cardiovascular Consultants.....................21

           Trinity-Mother Frances Health System ...............................................................23

      Billing for Unnecessary Services.....................................................................................23

      Prohibited Self Referrals, Stark Act, and 42 C.F.R. 13(b)(2)...........................................27

      ETMC Referral System and Stark Act.............................................................................32

CAUSES OF ACTION ......................................................................................................35

I.   Count 1: Violations of the False Claims Act for Presenting False Claims for Payment (31 U.S.C. § 3729(a)(1)(A)) ................................................... 35

II.  Count 2: Violations of the False Claims Act for Use of False Statements (31 U.S.C. § 3729(a)(2)(2000) and as amended, 31 U.S.C. § 3729 (a)(1)(B)) ........................................................................... 36

III. Count 3: Violations of the False Claims Act for Conspiracy (31 U.S.C. § 3729(a)(3) and, as amended, 31 U.S.C. § 3729 (a)(1)(C)) ........................ 36

IV.  Count 4: Violations of the False Claims Act for Use of False Statements (31 U.S.C. § 3729(a)(7)(2000) and as amended, 31 U.S.C. § 3729 (a)(1)(G)) ........................................................................... 37

DAMAGES AND OTHER REQUESTS FOR RELIEF ............................................... 37

CONDITIONS PRECEDENT AND COMPLIANCE WITH FALSE CLAIMS ACT........................................................................................................... 39

DEMAND FOR JURY TRIAL ................................................................................ 39

PRAYER FOR RELIEF .......................................................................................... 39

**EXHIBITS**
Exhibit 1 – Form CMS-2552-10
Exhibit 2 – Transcript of Audio Recording; Conversation with Betsy
Exhibit 3 – Transcript of Audio Recording; 11-18-13 Conversation with Johnny
Exhibit 4 – Transcript of Audio Recording; 10-29-13 Conversation with Johnny
Exhibit 5 – Transcript of Audio Recording; 11-7-13 Conversation with Betsy
Exhibit 6 – Transcript of Audio Recording; 11-14-13 Conversation with Joel Culver
Exhibit 7 – Recording of Conversation with Joel Culver on 12-20-13
Exhibit 8 – Recording of Conversation with Johnny Shedd on 12-20-13
Exhibit 9 – Recording of Conversation with Betsy Bowlin on 07-10-14
Exhibit 10 – Transcript of Audio Recording; 07-25-14 Conversation with Betsy
Exhibit 11 – Transcript of Audio Recording; 08-05-14 Conversation with Samantha
Exhibit 12 – Transcript of Audio Recording; 10-17-14 Conversation with Samantha
Exhibit 13 – Transcript of Audio Recording; 10-22-14 Conversation with Aaron Jung
Exhibit 14 – Transcript of Audio Recording; 09-04-14 Conversation with Bob Evans
Exhibit 15 – Transcript of Audio Recording; 10-21-14 Conversation with Elaine
Exhibit 16 – Transcript of Audio Recording; 11-26-13 Conversation with Dr. Govathoti
Exhibit 17 – Transcript of Audio Recording; 10-14-14 Conversation with Weiner and Lieberman
Exhibit 18 – Transcript of Audio Recording; 07-14-14 Conversation with Hudson
Exhibit 19 – Handwritten Notes from Meeting with Pearson-Wahl "Concerns"
Exhibit 20 – Emails from June 2010
Exhibit 21 – 06-14-10 Email from Jerry Massey
Exhibit 22 – 01-13-11 Email from Relator to Hudson and Reddy

Exhibit 23 – Transcript of Audio Recording; 02-18-14 Conversation with Brenda
Exhibit 24 – Transcript of Audio Recording; 03-19-14 Conversation with Dixie
Exhibit 25 – Transcript of Audio Recording; 11-08-13 Conversation with Shona
Exhibit 26 – Recording of Conversation with Mr. Hudson on 09-11-13
Exhibit 27 – Recording of Conversation with Dr. Phillips on 02-11-14
Exhibit 28 – 2nd Recording of Conversation with Dr. Phillips on 02-11-14
Exhibit 29 – Transcript of Audio Recording; 08-29-14 Conversation with Almohammed
Exhibit 30 – Recording of Conversation with Mr. Hudson on 07-17-14
Exhibit 31 – Transcript of Audio Recording; 11-06-13 Conversation with Michelle
Exhibit 32 – Transcript of Audio Recording; 02-11-14 Conversation with Dr. Govathoti

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **THE UNITED STATES** | § | **CIVIL ACTION NO. _____** |
| **OF AMERICA ex** *rel.* | § | |
| **IRAJ ROSHAN,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **EAST TEXAS MEDICAL CENTER,** | § | |
| **TRINITY-MOTHER FRANCES HEALTH** | § | |
| **SYSTEM, CHRISTUS TRINITY** | § | |
| **MOTHER FRANCES HEALTH SYSTEM,** | § | |
| **CHRISTUS HEALTH,** | § | |
| **TYLER RADIOLOGY ASSOCIATES,** | § | |
| **and TYLER CARDIOVASCULAR** | § | |
| **CONSULTANTS,** | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

This is an action brought on behalf of the United States of America by Relator Iraj Roshan against Defendants East Texas Medical Center, Trinity-Mother Frances Health System, Christus Trinity Mother Frances Health System, Christus Health, Tyler Radiology Associates, and Tyler Cardiovascular Consultants (collectively, "Defendants") pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.* Relator respectfully shows the Court as follows:

## INTRODUCTION AND NATURE OF CASE

1.     This case involves Medicare fraud. Medicare is administered through the Centers for Medicare and Medicaid Services ("CMS") of the United States Department of Health and Human Services ("HHS").

2.     This case is based on the Defendants' blatant and long-standing Medicare fraud in violation of the False Claims Act.

3.     The False Claims Act prohibits any person from making a false claim to the United States for payment, or making any false statement in order to get a false claim paid.

4.     The East Texas Medical Center ("ETMC") Defendants have instituted and/or systematically maintained laboratory processes that ETMC knows result in false positive results on cardiac enzyme tests, resulting in unnecessary admissions, the performance of unnecessary stress tests, unnecessary cardiac catheterizations, and other medically unnecessary procedures that would not have been performed or billed to and paid by Medicare if proper laboratory results had been obtained.

5.     Each year ETMC is required to file a cost report covering all Medicare payments on CMS Form 2552-10. All payments made by the United States under the Medicare program are considered provisional and are not final until the annual cost report is approved.  In the cost report, ETMC certified to the United States that the services identified in the cost report were provided in compliance with all laws and regulations regarding the provision of health care services.  As hereafter appears, those certifications on the annual cost reports were false, and ETMC knew them to be false. It is well established that such false certifications of compliance with the Medicare laws and regulations constitute violations of the False Claims Act.

6.     The Trinity-Mother Frances Health System and Christus Trinity Mother Frances ("Mother Frances") Defendants have submitted false claims to the United States by billing for hospital outpatient cardiac tests when in fact such tests were performed on a doctor's office basis. The Cardiology Consultant Defendants have conspired with the Mother Frances Defendants in committing the foregoing violations of the False Claims Act. The statements that the cardiac tests were performed on a hospital outpatient basis were false, and Mother Frances knew they were false.  Further, Mother Frances, like ETMC, is required to file an annual cost

report concerning charges made to the Medicare system, certifying that all services were rendered in compliance with all laws and regulations regarding the provision of health care services. Such statements were false, and Mother Frances knew they were false, when they were made on each annual cost report.

7.     The Tyler Radiology Associates ("TRA") Defendants have knowingly submitted false claims to the United States by charging Medicare for physicians' readings of imaging studies when in fact physicians did not read the studies.

8.     Tyler Cardiovascular Consultants ("CVC") Defendants have knowingly submitted false claims to the United States by charging Medicare for physicians' readings of imaging studies when in fact physicians did not read such studies and for charging hospital outpatient rates rather than physician office rates.

**PARTIES**

9.     Plaintiff/Relator, Iraj Roshan, is a physician licensed to practice medicine in the State of Texas who resides and practices in the Eastern District of Texas. His home address is not set forth here because of privacy concerns and to comply with the Court's policy against disclosure of such information. Dr. Roshan is bringing this suit on behalf of the Plaintiff, United States of American under the FCA.

10.     East Texas Medical Center is a corporation organized and existing under and by virtue of the laws of the State of Texas. Its principal place of business is 1000 South Beckham Street, Tyler, Texas 75701, and it may be served with process through its registered agent, Elmer G. Ellis, at 1000 South Beckham Street, Tyler, Texas 75701.

11.     Trinity-Mother Frances Health System at all times material hereto was a corporation or other form of business organized and existing under and by virtue of the laws of

the State of Texas. Its principal place of business is 800 East Dawson Street, Tyler, Texas 75701-2093 having Corporation Service Company dba CSC serve as their registered agent at 211 E. 7th Street, Suite 620, Austin, Texas 78701. Upon information Trinity-Mother Frances Health System merged with Christus Health on or about May 2, 2016 to form Christus Trinity Mother Frances Health System, with a registered office at 211 E. 7th Street, Suite 620, Austin, Texas 78701. Christus Trinity Mother Frances Health System may be served through its registered agent Corporation Service Company dba CSC at 211 E. 7th Street, Suite 620 Austin, Texas 78701. Christus Health is a corporation organized and existing under and by virtue of the laws of the State of Texas having its headquarters at 919 Hidden Road, Irving, Texas 75038. It may be served with process through its registered agent Corporation Service Company at 211 E. 7th Street, Suite 620, Austin Texas 78701.

12.     Tyler Radiology Associates is a professional association organized and existing under and by virtue of the laws of the State of Texas.  Its principal place of business in 3728 South Park Drive, Tyler, Texas 75703 and it may be served with process through its registered agent, Richbourg & Associates, PC, at 3728 South Park Drive, Tyler, Texas 75703.

13.     Tyler Cardiovascular Consultants is a professional association organized and existing under and by virtue of the laws of the State of Texas.  Its principal place of business is 619 S. Fleishel Avenue, Suite 101, Tyler, Texas 75701 and it may be served with process through its registered agent, Thaddeus R. Tolleson, at 2401 SSE Loop 323, Tyler, Texas 75701.

14.     The United States and relator Dr. Iraj Roshan have standing and capacity to file suit.  The correct defendants are being sued in their correct capacities.

15.     The facts and circumstances of the Defendants' violations of the federal False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, or

in any Congressional, administrative, or in any General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media. Relator is the original source of the information upon which this complaint is based, as that phrase is used in the federal False Claims Act, and he provided the required disclosures under the Act to the United States prior to filing.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction under 28 U.S.C. §1331 because this Complaint arises under the False Claims Act of the United States, 31 U.S.C. § 3729 *et seq*.

17.     The Court has personal jurisdiction over East Texas Medical Center, Tyler Radiology Associates, Trinity-Mother Frances Health System, Christus Trinity Mother Frances Health System, Christus Health and Tyler Cardiovascular Consultants because they are citizens of the State of Texas.

18.     Venue is proper in this District because the acts complained of occurred in this District. Further, pursuant to the provisions of 31 USC §3732(a) a civil action under 31 U.S.C. § 3730 may be brought in any district in which any defendant may be found. All Defendants are found in this District or, alternatively, the East Texas Medical Center Defendants and the TRA Defendants are found in this district, and this Court therefore has jurisdiction over all Defendants.

## BACKGROUND AND REGULATORY FRAMEWORK

**I.      Background on the False Claims Act and the qui tam private Attorney General provisions.**

19.     The False Claims Act was initially passed at the request of President Lincoln during the Civil War. It is the Government's primary civil remedy to protect the taxpayers against fraudulent and false claims. *E.g., http://www.justice.gov/opa/pr/justice-department-*

*recovers-nearly-6-billion-false-claims-act-cases-fiscal-year-2014*.    In  recent  years,  healthcare

fraud has become a major focus of the DOJ's False Claims Act suits.  *See id.*

20.      "The False Claims Act prohibits, in relevant part, 1) the presentment of a false

claim to the Government, 2) the use of a false record or statement to get a false claim paid, and

3) conspiracies to get a false claim paid."  *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 183

(5th Cir. 2009).  The Act expansively defines "claim" to cover "any request or demand, whether

under a contract or otherwise, for money or property ... if the United States Government provides

any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(c).

21.      False Claims Act liability is not limited to the specific defendant that filed the

false claim.  All defendants that knowingly participate in the submission of false claims are liable

under the False Claims Act.  *E.g.*, *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d

719, 735 (N.D. Ill. 2007) ("[A] defendant who actively participates in the knowing submission of

false claims is liable under the False Claims Act.") (collecting cases).

22.      "To aid the rooting out of fraud, the Act provides for civil suits brought by both

the Attorney General and by private persons, termed relators, who serve as a posse of *ad hoc*

deputies to uncover and prosecute frauds against the government."  *Grubbs*, 565 F.3d at 183

(quotations and citation omitted).

23.      "In *qui tam* suits brought by private persons on behalf of the Government the

statute entitles the relator to between ten and thirty percent of any recovery made on behalf of the

Government,  depending  on  the  extent  of  the  relator's  contribution  to  the  action."  *Id.*    A

successful  relator  also  recovers  her  reasonable  attorneys'  fees,  costs  of  court,  and  all  other

reasonable expenses of litigation.  31 U.S.C. § 3730.

## II.    Reporting Requirements and Payments

**A.    Hospitals and providers are required to certify compliance with all laws and related regulations as a condition and prerequisite to receiving Medicare payments.**

24.    Hospitals bill and receive payments from Medicare on a periodic basis.  As a condition of such payments, the hospital must file an annual cost report with Centers for Medicare and Medicaid Services ("CMS"), Form CMS-2552-10, certifying compliance with the Medicare laws and regulations.  42 U.S.C. § 1395f.  All Medicare payments received before the cost report is filed are conditioned on the certification contained in that report. 42 U.S.C. § 1395g; *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. Tex. 1997); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1035-36 (S.D. Tex. 1998).

25.    42 U.S.C. § 1395f allows for payment to providers of services as long as the provider certifies that the relevant conditions; such as that services were required to be given on an inpatient basis, that an inpatient diagnostic study is medically required, or that an individual may reasonably be expected to be discharged or transferred to a hospital within 96 hours. Requests for payment from Medicare or Medicaid submitted with false certifications violate the False Claims Act.

26.    Under Form CMS-2552-10, the hospital must certify that:

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by _____{Provider Name(s) and Number(s)} for the cost reporting period beginning _____ and ending _____ and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

A sample form is attached as Exhibit 1.

27. Form CMS-2552-10 also states that "[f]ailure to report can result in all interim payments made since the beginning of the cost reporting period being deemed overpayments (42 USC 1395g)." All charges on CMS-2552-10 are considered overpayment in the event of false certification.

28. All Medicare payments received by a hospital before the annual cost report is filed are provisional. 42 U.S.C. § 1395g. The payments do not become final until the hospital files its annual cost report, certifying compliance with all applicable laws and regulations. 42 U.S.C. § 1395; *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. Tex. 1997); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1035-36 (S.D. Tex. 1998).

29. In addition to the annual cost report form CMS-2552-10, providers also regularly submit claim forms CMS-1450 and CMS-1500, pursuant to 42 C.F.R. § 424.32, each of which include certifications.[1]

---

[1] CMS-1450 (Uniform Institutional Provider Bill) is a claim form for institutional provider billing for Medicare inpatient, outpatient and home health services used to submit claims to the Centers for Medicare & Medicaid Services. Page 15 of the CMS Manual System Publication 100-04 Medicare Claims Process guide states:

**B.     A hospital violates the False Claims Act by filing a false claim or falsely certifying compliance with all laws and submitting false claims.**

30.     "Generally, there are two types of False Claims Act violations, legally false claims (a claim provided in violation of a contract, specification, regulation or statute) and factually false claims (a claim for goods or services not provided)." *E.g.*, *United States v. Dialysis Clinic, Inc.*, 2011 WL 167246, at *13 (N.D.N.Y. Jan. 19, 2011).

31.     Under the legal false claims or "false certification" theory, both the Fifth Circuit and other courts have held that "false certifications of compliance create liability under the False

---

UB-04 NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

CMS-1500 (Health Insurance Claim Form) used by physicians and other suppliers to request payment for medical services, on page 2, states in part:

**NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties...**
                    SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE...
In submitting this claim far payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license#, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

Claims Act when certification is a prerequisite to obtaining a government benefit." *Thompson*, 125 F.3d at 902. As the Fifth Circuit explained: "Thus, where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *Id*.

32. Pursuant to Federal law and regulations, all payments made to hospitals and hospital systems are conditional and subject to adjustment or refund until the recipient has filed, and the government has approved, an annual cost report reconciling all payments. This cost report, at all times material to this Complaint, had to be filed under a form CMS 2552. This form requires the filer to certify under oath that all the services covered by the reconciliation were provided in compliance with all laws and regulations applicable to the provision of health care services. The hospital and hospital system Defendants filed the required cost reports for each year covered by this Complaint certifying that all services for each year were provided in compliance with all laws and regulations relating to the provision of health care services. That certification was, in each year, a false statement and, in each year, the hospital defendants actually knew the statement to be false, because in each year, ETMC and Mother Frances had actual knowledge that TRA and CVC radiologists were not reading the scans and that cardiac tests were being billed by CVC on a hospital outpatient basis when they could and should have been billed on a doctor's office visit basis. That certification was additionally, in each year, a false statement and, in each year, ETMC actually knew the statement to be false, because in each year, ETMC had actual knowledge of falsely elevated troponin test results, which led to unnecessary services being billed.

**III.    The Government's damages for false certification and fraudulent bills extend to all Medicare payments made to the Defendants, plus other statutory penalties.**

33.    The Fifth Circuit and other circuits have also held that defendants are liable for all Medicare payments by the Government pursuant to false certifications, regardless of whether the defendants in fact provided the underlying medical services.

34.    The Fifth Circuit addressed this precise issue in *Peterson v. Weinberger*, 508 F.2d 45 (5th Cir. 1975).    In *Peterson*, a non-physician owner falsely certified bills for physical therapy.    The defendant argued that there was no violation of the False Claims Act because the patients actually received the services that they were entitled to, and thus there was no financial loss to the Government.

35.    The Fifth Circuit rejected this argument and affirmed damages of double[2] the amounts paid by Medicare on the false claims, plus penalties.    The Court explained:    "In short, the services billed were plainly not 'covered' services [under Medicare], and the Government thus paid on the basis of the false claims presented."    *Id.* at 52; *see also U.S. ex rel. Longhi v. Lithium Power*, 575 F.3d 458, 472-73 (5th Cir. 2009) (affirming damages under the False Claims Act as the "amount actually paid to the Defendants" as a result of their false certification).

36.    Similarly, in *U.S. v. Rogan*, 517 F.3d 449 (7th Cir. 2008), the defendants engaged in a conspiracy to violate the False Claims Act.    The Seventh Circuit held that the defendants were liable for all Medicare funds received as a result of the false certification.    The court rejected any argument that the patients received the medical services billed for and thus the Government suffered no damages.    The court explained:    "Nor do we think it important that most of the patients for which claims were submitted received some medical care—perhaps all the

---

[2] The False Claims Act was subsequently amended to provide for treble damages, not double damages.

care reflected in the claim forms." *Id.* at 453. "The government offers a subsidy (from the patients' perspective, a form of insurance), with conditions. When the conditions are not satisfied, nothing is due. Thus the entire amount that Edgewater received on these 1,812 claims must be paid back." *Id.*

37. The *Rogan* court continued: "Now it may be that, if the patients had gone elsewhere, the United States would have paid for their care. Or perhaps the patients, or a private insurer, would have paid for care at Edgewater had it refrained from billing the United States. But neither possibility allows Rogan to keep money obtained from the Treasury by false pretenses, or avoid the penalty for deceit." *Id.*

38. Other courts have reached exactly the same conclusion: the plaintiff's damages include all Medicare funds received as a result of the false certification. *E.g.*, *U.S. ex rel. Freedman v. Suarez-Hoyos*, 2012 WL 4344199, at *5 (M.D. Fla. Sept. 21, 2012) ("Accordingly, as explained above, the Court rejects Wasserman's argument that the Government's damages are zero due to the value of the services performed. Instead, the Court concludes that, assuming the Government proves that it paid claims that were tainted by a kickback arrangement and that it would not have paid such claims had it known the truth, the amount of the Government's damages resulting from the payment of such claims equals the full amount that Medicare paid.").[3]

---

[3] *See also United States v. Mackby*, 339 F.3d 1013, 1018-19 (9th Cir. 2003) ("Mackby's false claims also harmed the government, in the form of both monetary damages and harm to the administration and integrity of Medicare. The fact that Mackby's clinic actually performed the physical therapy for which he claimed reimbursement does not eliminate the government's injury. . . . Had Mackby been truthful, the government would have known that he was entitled to nothing because he was neither a doctor nor a physical therapist in private practice."); *U.S. ex rel. Feldman v. Van Gorp*, 697 F.3d 78, 88 (2d Cir. 2012) (holding that "the government is therefore entitled to damages equal to the full amount of grants awarded to the defendants based on their false statements."); *U.S. ex rel. Wall v. Circle C Const., LLC,* 2014 WL 4199097, at *16

## FACTS

### Billing for Services Not Performed

#### East Texas Medical Center and Tyler Radiology Associates

39.     TRA is a group of nineteen radiologists (John P. Andrews, Charles D. Crum, Thomas K. Hayes, Kurt S. Reuland, Gregory A. Schultz, Michael D. Williams, S. Kirk Armstrong, Thomas J.B. Arnold, Bruce C. Carter, Timothy Leihgber, Alfred D. Llave, David P. Riepe, Douglas B. Macha, Robert C. Weissmann, Kevin A. Short, R. Kent Walker, Robert B. Sanchez, Robert H. Reuter).  TRA reads imaging studies for multiple hospitals in the ETMC Health System, including scans performed in outpatient clinics and outlying facilities. According to the administrator, Janice Leonard, TRA reads approximately 1,700 abdominal ultrasounds per month and approximately 3,500 other ultrasounds. TRA covers ten hospitals, including both ETMC and Mother Frances flagship hospitals.

40.     ETMC works with TRA, and both bill the patients and payers (mostly Medicare). For the most part ETMC bills for both performing the study and reading it, then remits the physician's fee for reading to TRA. Occasionally TRA bills for reading the studies and ETMC bills separately for performing the imaging.

41.     When an ultrasound is done, the technologist generates a "preliminary report" that is sent to the TRA Radiologist.  The purpose of the "preliminary" is to be used as a "cheat sheet" so the Radiologist does not have to go back and forth and look at the individual numbers and measurements used in the dictation.  The "preliminary" is also at times given to the emergency room physicians who may have to make a quick decision while waiting for the formal reading.

---

(M.D. Tenn. Aug. 22, 2014) ("[W]hen the government conditions payment on certain requirements, its damages may amount to all payments tainted by a contractor's failure to comply with those requirements, with no reduction for the value the government received.").

42.     TRA radiologists often dictate their reports straight from the "preliminary report" supplied by the ultrasound technician rather than personally analyzing the actual images.  The turnaround on these reports is too fast (within a minute of image transmission) to allow a radiologist to actually read the scan.  This is proven by reviewing the timestamps on the films and reports and is confirmed by the many hours of audiotape collected by Relator during which the ultrasound technicians and the Director of Radiology at ETMC Carthage Hospital complain about the rapid turn-around time and the fact that the reports are received prior to the radiologist having had time to review the scans.[4]  ETMC is actually aware of this practice as shown by a discussion with the administrator at ETMC Carthage Hospital.   Further, the radiology technicians have made multiple complaints to hospital administrators, during which they detailed their concerns. From at least 2008, TRA, ETMC, and Mother Frances have billed Medicare for radiologists' fees for ultrasound tests when the radiologists did not read the images. This scheme has cost Medicare millions of dollars per year in each of the past six years – and has resulted in misdiagnoses or has imposed upon the patients a serious risk of misdiagnosis. Each month TRA, ETMC, and Mother Frances's physicians bill for reading an average of 5000 imaging studies which have been neither read nor interpreted by the billing physician.   The average Medicare/Tricare reimbursement for reading an imaging study is $80.00 per study so the total false billings may exceed $5 million per year.

43.     The Technical Director of Radiology at ETMC Carthage, Joel Culver stated on November 18, 2013 that he believed the practice of not reading the actual films was dangerous, fraught with liability, and constituted fraud.[5]

---

[4]  *See* transcript attached as Exhibit 2 and incorporated herein by reference.

[5] *See* transcript attached as Exhibit 3 and incorporated herein by reference.

44.     On October 28, 2013, Betsy Bowlin, an ultrasound technologist at ETMC Carthage, stated to Relator that Johnny Shedd, the registered vascular technologist at ETMC Carthage, told her that he sent his carotid Doppler to Tyler and the reading was done in 35 seconds.  Ms. Bowlin then stated, "Yeah that happens a lot you know they [the radiologists] didn't look at the pictures they didn't look at anything they read a few numbers and that was it. That irritates me and that doesn't just happen with the Dopplers.  It happens with all the studies [meaning nonvascular ultrasound studies] … Once he [Johnny Shedd, the vascular technologist] hit END … after a venous study and turned around and sat down on his chair and refreshed his screen and the study had already been read."  Ms. Bowlin further stated "just 20 – 30 seconds max.  Which is ridiculous."[6]

45.     During an October 29, 2013 recording between Relator and Johnny Shedd, Relator asked:

> Relator: "The one [vascular ultrasound] that you did for Dr. Akpassa for carotid duplex that you said came back in 35 seconds, is it just one or two of them [the radiologists] that they do this or?"
> Mr. Shedd: "No we have to monitor all of them."
> Relator: "All of them?"
> Mr. Shedd: "Yeah, this is pathetic."
> Regarding a patient, Mr. Shedd: "They sent him back … now we already did his bladder and kidneys … We do a pelvic ultrasound, we have already done it … what part of 'I want this done do you not understand.'  Did the exact pictures again but charged him again."[7]

46.     In a recorded conversation on November 7, 2013, between Relator and Betsy Bowlin, Ms. Bowlin, stated, "No honestly I don't believe they [radiologist] do [read the ultrasounds], Dr. Roshan.  I can't say 100% that they don't.  I can say that more often than not, the studies are dictated before and you know that they haven't looked at the images.  They just

---

[6] *See* transcript attached as Exhibit 2 and incorporated herein by reference.

[7] *See* transcript attached as Exhibit 4 and incorporated herein by reference.

haven't. They don't have time to. It's like Johnny [the vascular technologist] says. If you talk to ... they pretty much dictated... It's pretty routine..."[8] This practice is widespread throughout East Texas and elsewhere covered by TRA.

47.    In a recorded conversation on November 14, 2013, Relator asked Joel Culver, Director of Radiology at ETMC Carthage, "Question? Can ETMC as far as radiology try to just get rid of them and send everything to Virtual Radiology or Nighthawk? [Mr. Culver shakes his head]". Relator asked, "Why not?" Mr. Culver responded, "Very expensive. VRC is very expensive."[9] Mr. Culver knew the practice was ongoing and knew it was dangerous and fraudulent, but the higher cost of alternate readers was a barrier to going for another group.

48.    In a November 18, 2013 recorded conversation between Relator and Johnny Shedd, Mr. Shedd expressed his outrage because the radiologist dictated negative reading on a very obvious case of several clots in the veins and calling it a negative study. "So I had to call them back up and say for the love of God somebody re-read this study."[10]

49.    In another November 18, 2013 recorded conversation, Joel Culver stated to Relator, "It puts us in an embarrassing situation to correct the radiologists, ask them to please re-read the study. We know that they are busy... It's dangerous, fraught with liability and this again is reflection of having monopoly..." Relator stated, "Because, what is going on, I don't know if you can call it anything other than fraud." Mr. Culver responded, "It is, it is."[11]

50.    In a December 20, 2013 recorded conversation between Relator and Joel Culver, Relator asked Mr. Culver, "Have you had any more talk with the radiology manager in Tyler to

_____

[8] *See* transcript attached as Exhibit 5 and incorporated herein by reference.

[9] *See* transcript attached as Exhibit 6 and incorporated herein by reference.

[10] *See* transcript attached as Exhibit 3 and incorporated herein by reference.

[11] *See* transcript attached as Exhibit 3 and incorporated herein by reference.

see if they're gonna start reading the studies or…" Mr. Culver said, "No, haven't heard anything." Relator says, "Johnny says it's still the same story." Mr. Culver responded, "Right."[12]

51.     In a recorded conversation dated December 20, 2013, Relator asked Johnny Shedd, "Have they [TRC] changed their behavior in any way?" Mr. Shedd said, "No they're not going to [change behavior of not reading films]." Relator said "Legally it is fraud." Mr. Shedd said, "No, they haven't changed."[13]

52.     During a July 10, 2014, recorded conversation Relator asked Betsy Bowlin "but were you saying in regular ultrasound they were doing the same thing, not just vascular." Ms. Bowlin said, "Uh huh," agreeing that the radiologists are not actually reading the films.[14]

53.     In a July 25, 2014 recorded conversation, Betsy Bowlin told Relator that a very "recent" general ultrasound (not vascular ultrasound) study was dictated by TRA just one minute after it was transmitted (looking at the timestamp on the last image), meaning it could not have been analyzed in that short time.[15]

54.     ETMC knowingly allowed and continues to allow TRA to "read" the ultrasound studies when they are aware that the radiologists are not actually reading the images. By billing for such "readings" and/or by providing the billing information to TRA, ETMC knowingly makes and enables TRA to make false claims for payment to the United States This practice is not only a violation of the False Claims Act, it endangers the health and lives of patients covered by government health programs.

---

[12] *See* audio recording attached as Exhibit 7 and incorporated herein by reference.

[13] *See* audio recording attached as Exhibit 8 and incorporated herein by reference.

[14] *See* audio recording attached as Exhibit 9 and incorporated herein by reference.

[15] *See* transcript attached as Exhibit 10 and incorporated herein by reference.

55. By giving the billing information to Tyler Radiology Associates, ETMC makes it possible for TRA to make claims to the government knowing that what TRA is doing is fraudulent and dangerous to patients. In return, ETMC gets to bill for its share (the technical part) of the studies that are not legitimately "interpreted/read" because the radiologist does not actually spend the amount of time required to read the images. Further, and/or in the alternative, ETMC is billing for the services of its technologists and technicians for interpreting imaging studies that they are neither qualified nor licensed to interpret.

**Violations by Tyler Cardiovascular Consultants and ETMC**

56. CVC is a cardiology group affiliated with ETMC in a Professional Service Agreement (PSA) as of August 15, 2014. As hereafter appears, prior to the above affiliation, CVC was affiliated with Mother Frances Hospitals and Clinics.

57. In a taped conversation on August 5, 2014, Samantha Clark, a Registered Vascular Technologist but not registered as an Echocardiographer, explained that when she does an echocardiogram (ultrasound of the heart) for CVC in ETMC Henderson and Pittsburg, Texas, she has to enter her report and "read" it for them. She stated that she does not feel comfortable and does not know "how they get away" with just signing her readings and billing rather than reading it themselves.[16]

58. On October 17, 2014, Ms. Clark stated that CVC "want[s] everything, ...I've never seen them change one. That's all I can say. And, you know, I mean, even though you do them for years... looking at it, agreeing, disagreeing. I don't mind you disagreeing with me." Relator said, "So, they expect you to even put the summary there and everything?" Ms. Clark responded, "I don't but yeah you do. You run into trouble for not doing it. That's the reason

---

[16] *See* transcript attached as Exhibit 11 and incorporated herein by reference.

I'm not over there, though." Relator asked, "So you don't go to Henderson anymore?" Ms. Clark answered, "I'm never available if you know what I mean?"[17] As the more recent conversations demonstrate, because of shortage of technologists in Henderson, Ms. Clark finally ended up doing more echocardiograms in Henderson, where she still does some work. She said, "It just puts you on the spot. Because it's like I want the ability to say I see something now you decide what it is."[18]

59.  On October 22, 2014, Aaron Jung, the former Radiology Director at ETMC Henderson, told Relator that when he [Aaron] pulls Doctors Hector and Carney to read a stress echo or nuclear stress for him, they do a thorough job, but, agreed that CVC is very bad about blasting through them and that independent physicians have complained multiple times about the fact that CVC's readings are inaccurate and incomplete.[19]

60.  ETMC knowingly allowed and continues to allow CVC to bill for reading the cardiac studies when they are aware that the CVC physicians are not actually reading the images. ETMC thereby makes and enables CVC and its physicians to make, false claims to the government. This practice is not only a violation of the False Claims Act, it endangers the health and lives of the patients served by ETMC and CVC.

61.  By giving the billing information to CVC, ETMC makes it possible for CVC to make claims to obtain payment from the government knowing that what CVC is doing is fraudulent and dangerous to patients. ETMC profits from participating in these false claims by increasing the number of imaging studies for which it bills the government. It further bills for having its technicians and technologists interpret imaging studies and billing for doing so when

---

[17] *See* transcript attached as Exhibit 12 and incorporated herein by reference.

[18] *See* transcript attached as Exhibit 12 and incorporated herein by reference.

[19] *See* transcript attached as Exhibit 13 and incorporated herein by reference.

the technicians and technologists are not qualified to read or interpret the studies.

**Violations by Trinity-Mother Frances Health System**

62.    Mother Frances is a large healthcare system that operates numerous hospitals and other facilities throughout East Texas and within this District.   It has agreements and/or arrangements with Tyler Radiology Associates similar to those between TRA and ETMC and bills for reading ultrasound images that are not actually read by TRA, as described above with regard to ETMC's False Claims Act violations. Likewise, it has agreements and/or arrangements with CVC similar to those between CVC and ETMC and bills for services not actually performed. Relator's personal experience, as well as statements made by Samantha Clark on August 15, 2014, establish that technologists in East Texas are interpreting tests and studies while the defendants are billing Medicare as though those studies were read and interpreted by physicians. Exclusive reliance on those files and the failure of radiologists to duly read the images creates not only false claims to the government for the "review" by radiologists and/or cardiologists, but increases the amounts billed for unnecessary procedures and leads to improper treatments. Further, it places patients at risk due to possible misdiagnoses and due to the risks of unnecessary tests and studies performed to "rule out" possible conditions not indicated by the initial tests properly performed and interpreted.

63.    The magnitude of the risks imposed upon the patients who depend upon the defendants for medical diagnosis and treatment is evidenced by the fact that Smith County, Texas alone has more cardiologists than the Republic of Ireland yet also has one of the worst cardiac (and stroke) outcomes in the nation. This is in part due to manipulation of referrals, corruption of medical practice to increase collection from the third parties including Medicare, knowing misuse and mis-calibration of laboratory equipment, and knowing use of unqualified

and unlicensed personnel to interpret tests and imaging studies while billing as though they were interpreted by qualified licensed physicians.

**Up Coding**

### East Texas Medical Center and Tyler Cardiovascular Consultants

64.    One large Level I trauma hospital administrator confided to Relator on September 4, 2014 that ETMC and CVC had implemented a scheme to bill for cardiac tests as hospital outpatient services, rather than a physician office visit. He explained to Relator that the scheme resulted in twice as much Medicare revenue, and the scheme had been implemented to combat "decline in Medicare reimbursement" and "stabilize physician income."[20] This practice is done as part of the Physician Service Agreement between ETMC and CVC pursuant to which procedures such as (but not limited to) catheterizations, stent placements, nuclear stress tests, and echocardiograms are being billed as hospital outpatient services.

65.    From at least August 14, 2014, ETMC and CVC have falsely billed Medicare for performing not less than 4000 echocardiogram tests, as well as other tests, on a "hospital outpatient basis", funneling procedures that would otherwise have been done and billed at a physician's office. This is accomplished by a variety of mechanisms including providing incentives to practicing physicians to refer cases to ETMC hospitals rather than to local physician offices with the personnel, equipment, and experience to perform such procedures. The cost of an echocardiogram in a hospital outpatient setting is approximately $350 per test and at least 400 tests on Medicare patients are falsely up coded each month for the past 10 months, resulting in damages to the Medicare program in the amount of at least $1.4 million.

---

[20] *See* transcript attached as Exhibit 14 and incorporated herein by reference.

66.    In a recorded conversation on October 21, 2014, Elaine Hight, the Referral Coordinator in ETMC Carthage Hospital told Dr. Roshan that her bosses in Tyler, not the doctors in Carthage, have told her to send all cardiac patients 75 miles away to Tyler rather than to an available non-affiliated Cardiologist in Carthage.[21]  If the patients see Dr. Roshan in Carthage, they can get their studies in their hometown in Carthage or in Longview, where the quality is better and the cost, billed as a doctor's office visit, is much cheaper than in ETMC Carthage or CVC/ETMC office in Tyler.  So, while the U.S. Government, through subsidies enables ETMC Rural Health Clinic to survive in Carthage an make healthcare available to the elderly and indigent, ETMC deliberately sends patients 75 miles away, driving on dangerous rural roads, to support a corrupted system with higher cost and no benefit to the patient.  The referral system is not unique to Carthage and exists all over East Texas, where ETMC has metastasized. Dr. Govathoti, ETMC Hospitalist in Tyler, Henderson and Carthage ETMC hospitals, on November 26, 2013, told Dr. Roshan that, in Tyler, Hospitalists are scared and all consults and procedures have to go to CVC.[22]  Dr. Lieberman, a competitor cardiologist affiliated with Cardiovascular Associates-East Texas (CAET), on October 14, 2014 told Dr. Roshan that if Hospitalists do not send the unassigned patients to CVC, they will get fired.[23]  As the evidence indicates the entire business CVC shared with ETMC does not meet the Medicare conditions and if so, the entire amount of CMS revenue shared between ETMC and CVC over the past 10 months should be returned to CMS.  The damages to CMS is between $5 million and $15 million.

---

[21] *See* transcript attached as Exhibit 15 and incorporated herein by reference.

[22] *See* transcript attached as Exhibit 16 and incorporated herein by reference.

[23] *See* transcript attached as Exhibit 17 and incorporated herein by reference.

67.     In another scheme, ETMC bills the government for dispensing drugs to "outpatients" when in fact they are bought from a commercial pharmacy and simply marked up. Mr. Hudson, an ETMC administrator, told Relator that ETMC had established a drug-dispensing program that was "a win for everyone except the government." Mr. Hudson revealed that ETMC was billing the government retail rates for outpatients' drugs prescribed by physicians associated with ETMC clinic and Emergency Room operations. Hudson told Relator that ETMC was paid for outpatient medications that were actually dispensed by CVS and Wal-Mart. [24]

**Trinity-Mother Frances Health System**

68.     Mother Frances was also involved with Tyler Cardiovascular Consultants (CVC) in a scheme involving up-coding to bill Medicare for hospital outpatient charges instead of physician office charges for office procedures, as explained earlier.  The above scheme doubled the cost or care to payers, mostly Medicare/CMS.   After its contract with Mother Francis expired, CVC transferred its scheme to ETMC, and Mother Frances is in the process of negotiation with another group to continue overbilling.

69.     From at least 2008 through the expiration of the contract, Mother Frances and CVC falsely billed Medicare for performing at least 10,000 echocardiograms on a hospital outpatient basis, funneling procedures that could have been done at a physician's office to a hospital outpatient service, which doubled the cost. This resulted in damages to the Medicare program in the amount of at least $3.5 million.

**Billing for Unnecessary Services**

**ETMC**

70.     Cardiac marker tests are used to determine which of the patients who present to

---

[24] *See* transcript attached as Exhibit 18 (starting at page 7) and incorporated herein by reference.

ER with discomfort suggestive of or suspicious for heart attack are at risk and/or should undergo additional diagnostic testing. The most widely used markers target myocardial troponin that is released from the heart muscle into blood as a result of a heart attack.

71. From at least 2005 to the filing of this Complaint, ETMC has knowingly certified false positive results on cardiac laboratory blood tests and, based on these knowingly false certifications, performed unnecessary stress and other cardiac tests. Upon information, ETMC has billed Medicare for at least 100 false positive blood tests and, based thereon, has performed at least 100 unnecessary admissions, transfers, and other tests and nuclear cardiac stress tests each year at roughly $3,000, resulting in damages to the Medicare system and the United States exceeding one million dollars. The details surrounding Relator's discovery of this scheme, including the person making the statement, the statement or statements made, the date and time when the statements were made, and supporting recordings and documents are attached.

72. From 2005-2011, the ETMC hospital in Carthage had an inordinate number of patients admitted or transferred with initial laboratory results falsely showing elevated troponin levels. As a result of these false test results, patients who had not and were not in danger of suffering heart attack were unnecessarily admitted to ETMC hospitals, and ETMC facilities. These facilities then performed unnecessary tests and procedures, including, without limitation, stress tests and catheterizations. These false and erroneous test results were caused by the mis-calibration of laboratory test equipment and misuse of such equipment by ETMC personnel. From at least 2005, ETMC administration was actually aware that their laboratory equipment was not properly calibrated and that their employees were not using the equipment correctly. ETMC was actually aware that such misuse and mis-calibration was resulting in the administration of unnecessary tests that were billed to the United States, such as heart

catheterization and nuclear stress tests. These tests were not only unnecessary but imposed serious and unnecessary health risks on ETMC patients. Heart catheterization carries a significant risk of major complication or death, and nuclear stress tests impose a statistically significant risk of cancer. Because the ETMC laboratory was reporting so many false positive results for heart attack, Relator asked ETMC to increase the threshold for additional testing from a troponin level of .04 to a level of .08. Myrna Brisend, BSMT, of Beckman Coulter Company, the manufacturer of ETMC's laboratory equipment, told Relator in 2009 that the assays were abnormal because they were not spun long enough – i.e., the process was being performed incorrectly. Relator discussed this with the administration at ETMC. Relator kept a copy of a hand-written note that he had given to Kim Pearson-Wahl (a corporate vice president of ETMC) in 2009.[25] There are also emails in June of 2010[26] and finally a response from Jerry Massey (then Corporate VP for affiliated hospitals) on June 9, 2010. Mr. Massey said he would have "our outside consultants provide a lab person who will look at them in the next several weeks. They will then provide the results to me, the med staff at Carthage and the Carthage Board."[27]

73.     The action by Mr. Massey along with the resignation of Pat Liston (the lab manager) resulted in a closer monitoring of temperature in the lab, using two different assays in parallel. However, on December 14, 2011, Dr. Chris White from Beckman Coulter told Relator that the technicians were again not doing their job correctly. He explained to Relator that small temperature variations did not explain large inaccuracies, but did not want to furnish a written statement.

74.     Relator sent an email on January 13, 2011 to the Hospital Administrator

---

[25] *See* Exhibit 19 attached hereto and incorporated herein by reference.

[26] *See* Exhibit 20 attached hereto and incorporated herein by reference.

[27] *See* Exhibit 21 attached hereto and incorporated herein by reference.

informing him about a patient Relator had seen that day who had a negative (for heart attack) cardiac catheterization with very high enzyme level (suggestive of heart attack) and the fact that the ETMC emergency room director, Dr. Reddy, had sent two more cases the week before to Longview with falsely elevated troponin.  When confronted, Mr. Hudson, the Administrator, responded with, "nobody died."  Hospital Administrator Hudson was well aware of the lab errors resulting in falsely high cardiac enzymes being reported.[28]

75.     Relator had a patient, T.W., who was born in 1930 and was diagnosed by a hospitalist with "Cardiogenic Shock."  T.W. finally died of H1N1 influenza, which was diagnosed very late after the initial negative cardiac work up, because the confused Hospitalist was focused on the wrong diagnosis. This patient had a normal stress test but was misdiagnosed because of abnormally high cardiac enzymes.  Relator asked the late Dr. Sturdivant to review the chart.  Dr. Sturdivant did so and agreed that Cardiogenic Shock was not the issue.  There were more cases of patients that suffered serious consequences of misdiagnosis stemming from faulty cardiac enzyme test results and leading to increased complications and costs to the government.

76.     In a recent discussion on February 18, 2014, Relator and Brenda Holland, stress lab technologist and respiratory therapist and current Cardiopulmonary Director, stated that for years there were days when 2 nuclear stress tests performed on individual patients with abnormal troponins.[29]

77.     The hospital discharge diagnosis (as explained to Relator by Rene Lawhorn, director of medical records) for those years showed very few people being discharged with the main diagnosis related to any cardiac condition that could result in elevated cardiac enzymes.

---

[28] *See* Exhibit 22 attached hereto and incorporated herein by reference.

[29] *See* transcript attached as Exhibit 23 and incorporated herein by reference.

78.     Lab tests continued to be a problem.  In a March 19, 2014 conversation with Dixie Booth, Lab Director at ETMC Carthage, Relator again pushed for the troponin threshold to be increased at ETMC Carthage because of too many false positives.[30] ETMC administration was aware of inaccurate results but continued to administer and bill for unnecessary hospital admissions and tests based upon laboratory tests that it knew were false and inaccurate.

**Prohibited Self Referrals, Stark Act, and 42 C.F.R. 13(b)(2)**

79.     ETMC has violated other laws and regulations regarding the provision of health care services.  42 C.F.R. 13(b)(2) guarantees each patient's right to request or refuse treatment and to be involved in care planning and treatment.  ETMC has systematically compromised and/or denied its patients these rights by establishing and enforcing a mandatory referral system that denies patients the right to choose and/or request care from their selected physician. On October 21, 2014, Elaine Hight, the "Referral Coordinator" in ETMC Carthage, told Relator that her bosses had instructed her to send all unassigned patients to CVC (in Tyler and Henderson) even if the patients preferred or requested another physician.[31]

80.     As ETMC worked towards a monopoly in East Texas, patients were being inappropriately kept at ETMC Carthage while their myocardial infarctions evolved, then transferred to ETMC Tyler the next day so as to avoid an Emergency Medical Treatment and Active Labor Act (EMTALA) violation.

81.     By late 2013, ETMC was pressuring physicians and referral coordinators to refer all cardiac patients to CVC cardiologists even though the patient might choose another physician, and despite the fact that the CVC Cardiology office at the ETMC Hospital in Henderson has one of the 3 worst heart failure readmission rates in the state.  CVC cardiac patients are often seen by

---

[30] *See* transcript attached as Exhibit 24 and incorporated herein by reference.

[31] *See* transcript attached as Exhibit 15 and incorporated herein by reference.

nurse practitioners or physician assistants, and at least one non-certified echocardiographer employed by CVC, Samantha Clark, claims to "read" the echocardiograms for CVC.

82.    Physicians in Carthage associated with ETMC were expressly told that all cardiac patients were to be referred to CVC, or otherwise ETMC would exclude them from referrals in their specialties.   Referring to CVC instead of local board certified cardiologists resulted in patient referrals to ETMC's more expensive treatment centers in Tyler, where cardiac tests were upcoded, falsely representing that the tests were being done on a hospital outpatient basis. In an email dated August 25, 2009, Relator expressed concerns that the referral scheme violated Federal law.

83.    Kim Pearson-Wahl (ETMC Corporate Vice President) stated in an email chain on May 05, 2010 that because Relator was being compensated by ETMC, all his patients were to be referred to ETMC for cardiac catheterization.   ETMC explicitly attempted to control where Relator admitted his patients and demanded the referral coordinators continue to funnel patients to ETMC in violation of the Stark Act and the Anti-Kickback statute and of the patients' rights under 42 C.F.R. 13(b)(2).

84.    Upon express instructions from ETMC administration, patients who were presented to the emergency department at ETMC Carthage were not transferred to the closest or most accessible qualified facility capable of treating them.   Instead, patients were sent to ETMC Tyler where cardiac testing could be upcoded as described above.

85.    In an email dated September 14, 2007, Relator complained to Mr. Hudson that the system described violated Federal law and resulted in charges to Medicare for unnecessary tests, and over-charging for those that were necessary.

86.     An email from Relator to Mr. Hudson dated September 06, 2007 demonstrates Relator's concern over the emergency room staff delaying the patient transfer to Tyler while waiting for "administrative approval" from Tyler.  Patient should have been transferred to the closest (or most readily available) facility capable of taking care of the patient rather than delaying transfer so the patients could be sent to ETMC Tyler where their treatment could be upcoded.  Relator made this clear in emails to Dr. Nielsen, Chief of Staff, and to Judy Peterson, Chief Nursing Officer.

87.     ETMC continuously pressured physicians and referral coordinators to refer only within the ETMC System.  Shona Guenther, LVN, a former referral coordinator who now works as a marketing person for Briarcliff nursing home in Carthage, explained to Relator that ETMC wanted all of the Medicare and privately insured patients sent to Tyler where upcoding and other practices described above resulted in higher reimbursement rates while the uninsured and state Medicaid patients were dumped on other facilities:   "'Cause they're not gonna get much for Medicaid patients."[32]  She explained that she had to go through an inquisition if she referred any Medicare or insured patient outside the ETMC system.

88.     On October 14, 2014, Dr. Stan Weiner, a former CVC Cardiologist, pointed out that CVC Cardiologists had been forced to join the ETMC system because they needed financial support (for Electronic Records, higher paying codes) and referrals.[33]  On the same audio file, Dr. Scott Lieberman, a Cardiologist practicing in Tyler, explained that ETMC Hospitalists have to consult CVC for Cardiology, otherwise they get fired by ETMC.[34]

---

[32] *See* transcript attached as Exhibit 25 and incorporated herein by reference.

[33] *See* transcript attached as Exhibit 17 and incorporated herein by reference.

[34] *See* transcript attached as Exhibit 17 and incorporated herein by reference.

89. Dr. Govathoti is a Hospitalist who works in ETMC Tyler, as well as in Carthage and Henderson. In a recorded conversation on November 26, 2013, she stated: "Well, they [ETMC Administration] really scared the Hospitalists in Tyler…".[35] Dr. Govathoti was suggesting that the patients will have their future admissions in ETMC and their procedures in "ETMC Hospital Outpatient" Facility (CVC office), benefiting both CVC and ETMC again, as Medicare and private insurance are charged for "Hospital Outpatient" visits and procedures at a much higher rate than that for a "physician office" visit."

90. In a recording on or about September 11, 2013, the local ETMC Administrator in Carthage (Mr. Hudson) told Relator, "You are great for us, but, you are not so good for Tyler and CVC is good for Tyler and CVC has a lot of leverage with corporate people in Tyler and they're gonna wanna see business from all over hospitals and if they're not seeing it you can bet your money….Yeah, it's that kind of situation and so, that's beyond my control!"[36]

91. In another conversation on February 11, 2014, Relator and Dr. Phillips discussed the legality ETMC's practice of guaranteeing minimum income levels and making other payments to physicians in order to obtain patient referrals. Dr. Phillips revealed that ETMC had compensated CVC for referring to ETMC exclusively: "I sat down with Carney [Dr. Carney, the most visible physician in CVC Cardiology group] and he said we got tired of dealing with Mother Frances…. ETMC came and said they would take care of all the patients and the 'freebees'."[37]

92. In addition to paying for exclusivity, ETMC negotiates deals with physicians for a pre-determined percentage of the physicians' patient referrals. In the conversation referred to in

[35] *See* transcript attached as Exhibit 16 and incorporated herein by reference.

[36] *See* audio recording attached as Exhibit 26 and incorporated herein by reference.

[37] *See* audio recording attached as Exhibit 27 and incorporated herein by reference.

the preceding paragraph, Dr. Phillips stated: "they came to you that they want 40% of your business … if they came to you and said we will buy a certain percentage of your business …. Sometimes when you are dealing with people, when I was negotiating my contract, the redline report issue came up, I said I will give you a third of the referrals coming out of my office …". "The way I got around the cardiology thing was that I told them I was going to handle it was if a patient requests I send them to you…the deal to buy my practice was done in 30 minutes."[38]

93.     On August 29, 2014, Dr. Almohammed, the ETMC Carthage Chief of Staff, discussed with Relator the pressure by ETMC to force physicians to refer patients to its Tyler facilities.  Dr. Almohammed told Relator that referring patients to ETMC Tyler was "a business call" and suggested the Relator discuss an arrangement with ETMC Administrator Hudson.[39]

94.     On October 21, 2014, Relator recorded a discussion with ETMC referral coordinator Elaine concerning ETMC's insistence that all cardiac patients be referred to CVC, the practice it owned:

> Elaine: "I do whatever they tell me to do."
> Relator: "It's the doctors who specify CVC or …[silence]?"
> Elaine: "I send them to CVC."
> Relator: "The doctors have told you that?"
> Elaine: "Well I mean that's a given…"
> Relator: "Who has told you that?"
> Elaine: "That's something I have been told all along."
> Relator: "By whom?"
> Elaine: "By bosses in the past."
> Relator: "You mean your bosses from Tyler?"
> Elaine: "Yes."
> Relator: "Not the doctors?"
> Elaine: "No!"
> Relator: "So, it comes from Tyler?"
> Elaine: "Right, Right." [40]

---

[38] *See* audio recording attached as Exhibit 28 and incorporated herein by reference.

[39] *See* transcript attached as Exhibit 29 and incorporated herein by reference.

[40] *See* transcript attached as Exhibit 15 and incorporated herein by reference.

95.     On November 20, 2014, a patient of Relator gave him permission to give her written complaint to the ETMC Carthage Chief of Staff about repeated attempts to send her to a Tyler Cardiologist instead of Relator (the Cardiologist for her husband and her brother) whom she trusted. The patient was later contacted and threatened by Mr. Gary Hudson.

96.     The ETMC Healthcare System intimidates its employees and other healthcare providers to refer patients within its "system": providers, hospitals and home health care practices and facilities it owns. Referrals not made within the ETMC "system" are systematically reviewed using computer-generated statistics to identify the providers who are not "supportive" of "the system". Explicit verbal warnings, retaliations and loss of referrals are common.

**ETMC Referral System and Stark Act**

97.     ETMC maintains practice data spreadsheets (PDS) on all affiliated medical practices. The PDS for the practices affiliated with the ETMC from February and March of 2011 (in Relator's possession) shows that ALL practices lost money in those 2 months. The PDSs are used to track profitability and losses by each clinic. Money is recouped through referrals.

98.     "Redline Reports" are generated monthly to track referrals by ETMC affiliated physicians, nurse practitioners and physician assistants. During a recorded conversation on November 8, 2013, former "referral coordinator" stationed in Carthage, Texas (the referral system exists in the entire ETMC system), told Relator that she had to run "redline reports" at the end of each month on physicians, reporting the percentage of out-of-ETMC system referrals for each provider, and why they were referred outside of the system (for instance, patient preference

or lack of subspecialist availability).[41] ETMC pressures physicians and referral coordinators to refer only within the ETMC System.

99.     The referral coordinator explained that ETMC wanted all of the Medicare and privately insured patients sent to Tyler while uninsured and Medicaid patients were dumped on others: "Uhm, 'Cause they're not gonna get paid much for Medicaid patients."

100.    On July 17, 2014, in response to Relator's complaint about the "redline reports," Mr. Hudson, the Carthage Hospital Administrator, said, "We still get those," and explained that ETMC has to evaluate relationships with the physicians based on physician "support" for the ETMC "system".[42]

101.    It is the policy of ETMC that all providers have to use the "referral system". ETMC enforces the referral system by tracking all referrals and threatening physicians who do not meet referral quotas with loss of business. Referral coordinators are forced to explain any referrals outside the ETMC "system".

102.    On February 11, 2014, Dr. Jim Jason Phillips stated, "It's coming from Tyler [ETMC Headquarters]… They have been riding my a__ about sending the patients to Tyler… It's a Tyler issue…". On February 11, 2014, Dr. Phillips said that when he was selling his practice to ETMC and during the financial negotiations, "Gary [Gary Hudson, ETMC Carthage Administrator] referred to it straight out. He referred to my redline numbers…"[43]

103.    On November 6, 2013, Michelle Davis, a recent local Referral Coordinator reported that, since Dr. Phillips joined ETMC, he calls to make sure referring to Azelia

---

[41] *See* transcript attached as Exhibit 25 and incorporated herein by reference.

[42] *See* audio recording attached as Exhibit 30 and incorporated herein by reference.

[43] *See* transcript attached as Exhibit 27 and incorporated herein by reference.

Orthopedics is considered referral to ETMC and will not show on his "redline report".[44] The fear of financial consequences from "subpar" redline reports forces the providers to use the ETMC subspecialists (when patients are insured or covered by Medicare). This results in delayed care, danger to patients, and increased costs to Medicare and private insurers.

104.    Dr. Govathoti is a Hospitalist who works in ETMC Tyler (flagship), as well as in Carthage and Henderson. Regarding ETMC Tyler, on November 26, 2013, she said, "Well, they [ETMC Administration] really scared the Hospitalists in Tyler…If the patient did not have a Cardiologist established, it has to go to CVC [the group affiliated with ETMC]."[45]

105.    On February 11, 2014, Relator asked Dr. Govathoti (after she had mismanaged a heart attack due to lack of familiarity with protocols and unwillingness to ask for help from a non-ETMC local Cardiologist) whether ETMC pressured Dr. Govathoti to send the patients to Tyler. Dr. Govathoti replied, "They're watching where you're sending patients. They have no right, but, you know, it's kinda like… It's better to play the game."[46]

106.    On September 2013, the local Administrator in Carthage (Mr. Hudson) told Relator, "CVC is good for Tyler and CVC has a lot of leverage with corporate people in Tyler and they're gonna wanna see business from all over hospitals and if they're not seeing it you can bet your money….Yeah, it's that kind of situation and so, that's beyond my control!"[47]

107.    Through the use of intimidation and redline reports ETMC financially rewards physicians who refer patients to it and to its owned practices and financially punishes physicians who refer patients to laboratories, outpatient facilities, and physicians not owned by ETMC, all

---

[44] *See* transcript attached as Exhibit 31 and incorporated herein by reference.

[45] *See* transcript attached as Exhibit 16 and incorporated herein by reference.

[46] *See* transcript attached as Exhibit 32 and incorporated herein by reference.

[47] *See* audio recording attached as Exhibit 26 and incorporated herein by reference.

in violation of the Stark Act and the Anti-Kickback laws.

## CAUSES OF ACTION

**I.** **Count 1: Violations of the False Claims Act for Presenting False Claims for Payment (31 U.S.C. § 3729(a)(1)(A)).**

108. Plaintiff re-alleges all of the above allegations as though fully set forth herein, including all the facts set forth above.

109. Plaintiff seeks relief against Defendants ETMC, Mother Frances, TRA, and CVC under the False Claims Act, Section 3729(a)(1)(2000) and as amended, 31 U.S.C. 3729(a)(1)(A).

110. Each year ETMC and Mother Francis, are required by law to prepare and file a Cost Report Certification and Settlement Summary with the Centers for Medicare and Medicaid Services (CMS) on Form 2552-10. That Form warns the filer that false statements made in the filing are violations of law and may lead to criminal and civil liability. The form specifically warns that if services identified in the cost report were provided or procured through the direct or indirect payment of a kickback, or were otherwise illegal, criminal and civil liability may result. Under law, any form of payment or incentive provided for referrals is an illegal kickback.

111. Immediately following the warnings described above, an officer or administrator of the filer is required to swear under oath: 1) that (s)he is familiar with the laws and regulations regarding the provision of health care services, and 2) that the services identified in the cost report were provided in compliance with all such laws and regulations. Under law, a false statement in a Form 2552-10 makes all Medicare billings covered by the report false claims under the False Claims Act.

112. As set forth in detail above, Defendants ETMC, Mother Frances, TRA, and CVC have each violated the False Claims Act and knowingly presented, or caused to be presented, a false or fraudulent claim for Medicare payments to CMS including, as described above:

a. Billing for services not actually performed;

b. Knowingly mis-calibrating laboratory equipment to give false results in order to bill for unnecessary tests, procedures, and hospitalizations;

c. Upcoding, or representing that tests and procedures are being performed on a hospital outpatient basis when in fact they are being performed as physician office services;

d. Obtaining patient referrals by means of positive and negative financial incentives in violation of the Stark and Anti-Kickback laws and regulations;

e. Intentionally compromising and coopting a patient's right to select his treating physician and/or other rights guaranteed to patients by law and regulation.

113.     Compliance with all laws and regulations is a condition to receiving Medicare funds.  CMS made Medicare payments to Defendants in reliance on these false certifications. The United States has been damaged as a direct result.

II.     **Count 2: Violations of the False Claims Act for Use of False Statements (31 U.S.C. § 3729(a)(2)(2000) and as amended, 31 U.S.C. § 3729(a)(1)(B)).**

114.     Plaintiff re-alleges all of the above allegations as though fully set forth herein, including all the facts set forth above.

115.     Plaintiff seeks relief against Defendants ETMC, Mother Frances, TRA, and CVC under 31 U.S.C. § 3729(a)(2)(2000) and, as amended, 31 U.S.C. § 3729 (a)(1)(B).

116.     Defendants ETMC, Mother Frances, TRA, and CVC made a record or statement, and caused to be made a record or statement, used in support of false claims to CMS for Medicare payments.  Defendants ETMC, Mother Frances, TRA, and CVC made and caused to be made false certifications to CMS.

III.     **Count 3: Violations of the False Claims Act for Conspiracy (31 U.S.C. § 3729(a)(3) and, as amended, 31 U.S.C. § 3729 (a)(1)(C)).**

117.     Plaintiff re-alleges all of the above allegations as though fully set forth herein, including all the facts set forth above.

118.     As set forth in detail above, Defendants ETMC, Mother Frances, TRA, and CVC

and the officers, directors, administrators, agents, employees, and physicians associated with each of them have conspired to commit violations of 31 U.S.C. § 3729 (a)(1)(A),(B),(D)-(G). Defendants took numerous acts in furtherance of this conspiracy, as detailed above. All persons who make a false claim or conspire with others to make such a claim are liable for the civil and criminal penalties prescribed by the Act.

**IV.  Count 4: Violations of the False Claims Act for Use of False Statements (31 U.S.C. § 3729(a)(7)(2000) and as amended, 31 U.S.C. § 3729(a)(1)(G)).**

119.    Plaintiff re-alleges all of the above allegations as though fully set forth herein including all the facts set forth above.

120.    Defendants ETMC, Mother Frances, TRA, and CVC knowingly made a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly avoided or decreased an obligation to the Government when they filed false CMS-2552-10 forms stating on the reconciliation that Defendants owed the Government less money than they actually did.

<u>DAMAGES AND OTHER REQUESTS FOR RELIEF</u>

121.    Between November 1, 2009 and October 31, 2013, Byron Hale, CEO of East Texas Medical Center reported and certified that the organization had allowable Medicare costs of $1,208,685,296.00.    When that amount is doubled to account for six years of violations, ETMC claimed allowable Medicare costs of $2,417,370,592.00.

122.    Between July 1, 2009 and June 30, 2013, Joyce Hester, CFO of Trinity-Mother Frances Health System reported and certified that the organization had allowable Medicare costs of $439,538,679.00.  When that amount is doubled to account for six years of violations, Mother Frances claimed allowable Medicare costs of $879,077,358.00.

123.    Tyler Radiology Associates has billed and certified the bills to Medicare of at

least $8.4 million in the last six years.

124. Tyler Cardiovascular Consultants has billed and certified the bills to Medicare of at least $10 million in the last six years.

125. Relator seeks multiple damages against the Defendants, as well as per violation penalties, all as provided by the False Claims Act.

126. Plaintiff seeks all available damages and other relief against all Defendants, including but not limited to:

- All general and special/consequential damages, including but not limited to all Medicare payments made to Defendants as a result of their false claims and/or false certifications.

- All other statutory damages and penalties, including but not limited to treble damages and statutory penalties, and an order barring Defendants from the Medicare and Medicaid programs.

- All applicable administrative remedies.

- Prejudgment and Post judgment interest.

- Reasonable attorneys' fees, costs of court, and other expenses of litigation (for both the U.S. Government and Relator Roshan).

- Relator's share of the proceeds recovered.

- All amounts by which Defendants have been unjustly enriched.

- All amounts the United States has paid by mistake.

- All other relief, at law and in equity, to which Plaintiff (both the U.S. Government and Relator Roshan) are entitled.

## CONDITIONS PRECEDENT AND COMPLIANCE WITH FALSE CLAIMS ACT

127.    Relator Roshan has complied with all filing requirements of the False Claims Act, including serving on the Government all written disclosure statements and material evidence and information, as well as a copy of this Complaint.  This complaint is also being filed under seal.

## DEMAND FOR JURY TRIAL

128.    Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues triable of right by a jury in this case.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff United States of America, ex rel. Iraj Roshan prays for all damages and all other relief, at law and in equity, to which they may be entitled, including but not limited to: all direct and special/consequential damages (including but not limited to all Medicare payments made to the Defendants as a result of their false certifications); all other statutory damages and penalties (including but not limited to treble damages, statutory penalties, and an order barring Defendants from the Medicare and Medicaid programs); all applicable administrative remedies; pre and post judgment interest, reasonable attorneys' fees, costs of courts, and other expenses of litigation; the relator's share of the recovery; all amounts by which Defendants have been unjustly enriched; all amounts the United States has paid by mistake; and all other relief, at law and in equity, to which Plaintiff may be entitled.

Respectfully submitted,

THE SYDOW FIRM

/s/ Michael D. Sydow
Michael D. Sydow
State Bar No. 19592000
5020 Montrose Boulevard, Suite 450
Houston, Texas 77006
(713) 622-9700 [Telephone]

(713) 552-1949 [Telecopier]
michael.sydow@thesydowfirm.com

***ATTORNEY IN CHARGE FOR PLAINTIFF
IRAJ ROSHAN***

**OF COUNSEL:**
Richard N. Laminack
S.D. Tex. ID No. 79678
State Bar No. 11850350
rickl@lpm-triallaw.com
Thomas W. Pirtle
State Bar No. 16038610
tomp@lpm-triallaw.com
LAMINACK, PIRTLE & MARTINES
5020 Montrose Boulevard, 9th Floor
Houston, Texas 77006
(713) 292-2750 [Telephone]
(713) 292-2755 [Telecopier]